567 So.2d 1143 (1990)
Jewell N. DONNELL, Jr., Plaintiff-Appellant,
v.
Wanda H. DONNELL, Defendant-Appellee.
No. 21770-CA.
Court of Appeal of Louisiana, Second Circuit.
September 26, 1990.
*1145 James M. Stephens, Winnsboro, Dennis G. Stewart, Delhi, for plaintiff-appellant.
Michael E. Kramer, Winnsboro, for defendant-appellee.
Before SEXTON and LINDSAY, JJ., and JASPER E. JONES, J., Pro Tem.
JASPER E. JONES, Judge, pro tem.
Appellant, Jewell N. Donnell, Jr., and appellee, Wanda H. Donnell, physically separated in March 1982. Mr. Donnell filed a suit for separation in May 1982, and a judgment of divorce subsequently was rendered in August 1983. However, neither party took legal action to partition the former community until Mr. Donnell filed a petition to partition in September 1988. Attached to his petition was a detailed descriptive list of the community assets and liabilities. Ms. Donnell traversed her former husband's detailed descriptive list later that month, and, in January 1989, filed her own detailed descriptive list. The Honorable Chet D. Traylor presided over trial on the merits held in July 1989. After judgment was rendered, Mr. Donnell filed a motion for new trial and a motion to recuse Judge Traylor. An ad hoc judge, appointed to hear the motion for recusal, denied the motion to recuse in August 1989. The following month, Judge Traylor denied the motion for new trial. Appellant then appealed not only the judgment partitioning the former community property, but also the judgment denying the motion to recuse, as well as the judgment denying the motion for new trial.
For the reasons which follow, we affirm both the judgment denying the motion to recuse and the judgment denying the motion for new trial. However, the judgment partitioning the former community property is reversed in part and amended.

THE MOTION FOR RECUSAL
Appellant's motion to recuse Judge Traylor alleged that Judge Traylor and his family were very close personal friends of Ms. Donnell and her alleged fiance, Marvin Cruse. The two groups were alleged to frequent each other's homes on a weekly basis, attend social gatherings together and coordinate leisure time to maximize *1146 contact with each other. However, the proof adduced at the trial of the motion to recuse fell far short of supporting these allegations. At best, appellant showed that Judge Traylor and Marvin Cruse were good friends, and that Marvin Cruse and Ms. Donnell dated each other on a regular basis. The evidence did not show that Marvin Cruse and Ms. Donnell were engaged or had any plans to marry, and did not show that Judge Traylor was a good friend of Ms. Donnell. Instead, the record reveals few contacts between Judge Traylor and Ms. Donnell, especially when one considers the small size of the rural community in which they live. Nor does the record indicate that Ms. Donnell was a close personal friend of any other member of the Traylor family.
The grounds for recusing a trial court judge are listed in LSA-C.C.P. Art. 151. The only ground which possibly could have application in the present case states that a trial judge may be recused when he is biased, prejudiced, or interested in the cause or its outcome, or is biased or prejudiced toward or against the parties or the parties' attorneys to such an extent that the judge would be unable to conduct fair and impartial proceedings. LSA-C.C.P. Art. 151 B(5). There plainly is no evidence of actual bias, prejudice or interest in this case. Nevertheless, appellant argued in the trial court, and argues on appeal, that Judge Traylor also could be recused on the basis of the appearance of impropriety. In support of his argument, appellant relies on the Code of Judicial Conduct Canons 1, 2 A and 2 B which underscore the need for an independent and impartial judiciary in which judges do not allow family, social, or other relationships to influence judicial conduct or judgment.
In Christian v. Christian, 535 So.2d 842 (La.App.2d Cir.1988), a case also involving a motion to recuse a trial court judge, this court expressed concern with the appearance of impropriety, but held that the list of grounds for recusation in Art. 151 is exclusive rather than illustrative. We further note that the Code of Judicial Conduct Canon 3 C provides: "The recusation of judges is governed by law." We believe this to be an obvious reference to LSA-C. C.P. Art. 151, et seq., and to indicate that the procedural articles, rather than the judicial canons, govern a recusation. Accordingly, finding no ground for recusation satisfied in this case, we find no error in the trial court's denial of the motion for recusation.
Moreover, we find that the evidence adduced does not raise even the appearance of impropriety. In rural districts, it is not at all uncommon for a judge to have a friendly relationship with numerous members of the community, but to nevertheless adjudicate legal issues which arise among community members. Appellant merely established that a party to the litigation had a close relationship with an individual who, in turn, was a good friend of the trial judge. No close, direct relationship was established between either the party and the trial judge or the party and the trial judge's family.

DENIAL OF MOTION FOR NEW TRIAL
The trial court minutes reflect that on the hearing of the motion for new trial, counsel for appellant simply offered the transcript of the prior recusation hearing as appellant's evidence. No evidence was offered by appellee. Subsequently, the court denied the motion for new trial.
Similarly, on appeal, appellant reurges the same arguments made in support of his assignments of error concerning recusation of the trial judge. For the same reasons we found no merit in the appellant's assignments of error regarding denial of the motion for recusation, we find no merit in appellant's assignment of error regarding denial of the motion for new trial.

PARTITION OF THE COMMUNITY
The partition of community property and settlement of claims arising from matrimonial regimes are governed by the provisions of LSA-R.S. 9:2801 which state:
When the spouses are unable to agree on a partition of community property or on the settlement of the claims between *1147 the spouses arising from the matrimonial regime, either spouse, upon termination of the matrimonial regime, or as an incident of the action which would result in a termination of the matrimonial regime, may institute a proceeding, which shall be conducted in accordance with the following rules:
(1) Each party shall file a sworn detailed descriptive list of all community property, the fair market value and location of each asset, and all community liabilities. Each party shall affirm under oath that the detailed descriptive list filed by that party contains all of the community assets and liabilities then known to that party. Amendments to the descriptive lists shall be permitted. No inventory shall be required. Upon motion of either party, the court shall set a time limit for the filing of each detailed descriptive list.
(2) Each party shall either traverse or concur in the inclusion or exclusion of each asset and liability and the valuations contained in the detailed descriptive list of the other party. Upon motion of either party, the court shall fix a time limit within which each party shall either traverse or concur. The trial of the traverses may be by summary procedure. At the trial of the traverses, the court shall determine the community assets and liabilities; the valuation of assets shall be determined at the trial on the merits. The court, in its discretion, may by ordinary procedure try and determine at one hearing all issues, including those raised in the traverses.
(3) The court may appoint such experts pursuant to Articles 192 and 373 of the Louisiana Code of Civil Procedure as it deems proper to assist the court in the settlement of the community and partition of community property, including the classification of assets as community or separate, the appraisal of community assets, the settlement of the claims of the parties, and the allocation of assets and liabilities to the parties.
(4) The court shall then partition the community in accordance with the following rules:
(a) The court shall value the assets as of the time of trial on the merits, determine the liabilities, and adjudicate the claims of the parties.
(b) The court shall divide the community assets and liabilities so that each spouse receives property of an equal net value.
(c) The court shall allocate or assign to the respective spouses all of the community assets and liabilities. In allocating assets and liabilities, the court may divide a particular asset or liability equally or unequally or may allocate it in its entirety to one of the spouses. The court shall consider the nature and source of the asset or liability, the economic condition of each spouse, and any other circumstances that the court deems relevant. As between the spouses, the allocation of a liability to a spouse obligates that spouse to extinguish that liability. The allocation in no way affects the rights of creditors.
In the event that the allocation of assets and liabilities results in an unequal net distribution, the court shall order the payment of an equalizing sum of money, either cash or deferred, secured or unsecured, upon such terms and conditions as the court shall direct. The court may order the execution of notes, mortgages, or other documents as it deems necessary, or may impose a mortgage or lien on either community or separate property, movable or immovable, as security.
(d) In the event that the allocation of an asset, in whole or in part, would be inequitable to a party, the court may order the parties to draw lots for the asset or may order the private sale of the asset on such terms and conditions as the court deems proper, including the minimum price, the terms of sale, the execution of realtor listing agreements, and the period of time during which the asset shall be offered for private sale.
(e) Only in the event that an asset cannot be allocated to a party, assigned by the drawing of lots, or sold at private sale, shall the court order a partition thereof by licitation. The court may fix *1148 the minimum bids and other terms and conditions upon which the property is offered at public sale. In the event of a partition by licitation, the court shall expressly state the reasons why the asset cannot be allocated, assigned by the drawing of lots, or sold at private sale.
The goal of the above-quoted provisions is an equitable and equal division of community assets and liabilities. The trial court has great discretion in effecting a fair partition, and is not required to accept, at face value, a spouse's valuation of assets or debts, or claims against the community. Kaplan v. Kaplan, 522 So.2d 1344 (La. App.2d Cir.1988); Mathews v. Mathews, 457 So.2d 746 (La.App.2d Cir.1984). Nevertheless, the trial judge's discretion is not without limitation. When there is clear evidence of a significant claim for reimbursement by one party, and evidence of the amount of such a claim is introduced or appears available, the trial court should not disregard the existence of such a claim because an exact dollar amount has not been fixed by the party seeking reimbursement. In the absence of uncooperativeness or indifference by a party, the goal of a fair and equitable partition indicates a judge should either set a reasonable value for the claim, or take further evidence in order for a reasonable value to be assigned to the claim. With these principles in mind, we now proceed to discuss particular decisions and findings made by the trial court in partitioning this community.

Standing Crops
Appellant's detailed descriptive list includes among community assets $8,000 for standing crops for the 1982 crop year. Appellant's testimony established that the $8,000 should have been attributed to the 1981, rather than the 1982, crop year. On the other hand, appellee's detailed descriptive list simply lists as a community asset "proceeds from cotton crops" with the value of the crops listed as unknown.
Testimony at trial by both appellant and appellant's father indicated that appellant was sharecropping with his family's corporation, and that, after expenses were deducted from gross profits, appellant paid half of his net profit to the corporation for the use of the land in farming operations. Appellee did not testify, but attempted to challenge appellant's evidence regarding the crops by introducing appellant's income tax returns for the years 1982 and 1983. Appellee also introduced into evidence copies of a 1982 check and receipt indicating that appellant had been paid $18,478.13 by the Noble Ellington Cotton Company in Winnsboro, Louisiana for the 1981 cotton crop. A copy of a 1983 receipt from the same company showed that appellant received $25,728.68 for the 1982 cotton crop. Appellant's income tax returns also showed expenses associated with the farming operation. Appellee's attorney questioned appellant and appellant's father with regard to the gross profits and expenses shown on the tax return, seeking an explanation of how the expenses and profits matched with the testimony concerning the sharecropping arrangement between appellant and his family's corporation. Neither appellant nor his father was able to correlate the income tax return figures with the sharecropping agreement.
At the conclusion of the trial, the trial court simply took the total of the two cotton receipts ($44,206), and awarded appellee half of that amount. For the reasons set forth below, we hold that the trial court clearly erred in this regard.
With respect to the 1981 cotton profits, both the income tax return and the receipt from the Ellington Cotton Company establish that the gross cotton profits for 1981 were approximately $19,000. However, appellant testified at trial that he had planted and harvested not only cotton, but also soybeans. The tax return clearly reflects that approximately $19,000 in gross profits were attributable to soybeans in that year. With respect to farming expenses, the return shows over $14,000 for rent of the land, and an additional $11,721 for "fertilizers, lime, chemicals." There were additional deductions as well. The total deductions came to $32,445, compared to gross profits of $43,084. Thus, the net farm profit was $10,639. Because approximately 75% of *1149 the gross farm profits were taken away by farming expenses, the trial court clearly erred in awarding appellee a cash figure for her portion of the cotton crop when that figure failed to take into account the farming expenses. Moreover, the figure used by the trial court also failed to take into account the other farming profits, including the profits on soybeans, in making its award for 1981 crops.
We further observe that the inability of appellant and appellant's father, while on the witness stand, to correlate the sharecropping agreement with the income tax figures did not disprove the accuracy of either the returns or the appellant's description of the agreement. First, not all items and amounts listed for profits and deductions necessarily would have been covered by the sharecropping agreement, or necessarily would have matched the agreement on a calendar year basis. Second, even if the 1982 tax return figure of approximately $14,000, attributable to rent of farm and pasture, arguably should approximate the amount of money representing appellant's share of the net farming profits under the sharecropping agreement, the tax return figure may support rather than refute appellant's explanation of the sharecropping agreement. When the listed expenses for fertilizers, lime, chemicals, and supplies purchased (approximately $15,000) are subtracted from the gross farm profits (approximately $43,000), the remainder is approximately $28,000. If this figure were a rough approximation of the total to be split between appellant and the corporation, then appellant's share would be approximately $14,000. This figure, in turn, favorably corresponds to the farm and pasture rent figure previously mentioned. Third, and most important, the appellant's sworn detailed descriptive list figure of $8,000 provides the only figure specifically addressing community net profits for standing crops in 1981. While appellee attempted to impeach appellant's testimony through evidence of gross cotton receipts, and through the previously-discussed income tax returns, appellee offered no evidence of net profits, nor asserted any figure of her own through her detailed descriptive list for net community crop profits. Finally, we note that it is quite possible that community expenses incurred prior to the termination of the community, but paid after the termination of the community, were paid from 1981 farm revenue. Under these circumstances, we accept appellant's sworn figure of $8,000 as being a reasonable figure for 1981 standing crops, and amend the judgment accordingly.
As previously mentioned, part of the amount awarded to appellee for crops included one-half of the $24,728.68 receipt for cotton for the year 1983. However, testimony at trial indicated that the 1982 crops had not been planted at the time appellant filed suit for separation from appellee. The legal regime of community property is terminated by a judgment of separation from bed and board, and such a judgment is retroactive to the date of filing. See LSA-C.C. Art. 2356 and comments. Thus, none of the 1982 farming profits should be considered community property. Therefore, the trial court erred in awarding appellee any amount for the 1982 crops, and his judgment is reversed in this respect.

Cattle
Appellee's detailed descriptive list contains an item for cattle whose value is listed as unknown. Testimony at trial established that appellant had approximately 12 to 15 cattle at the time he married appellee in June 1969. Testimony further established that he and appellee owned approximately the same number of cattle at the time they separated in 1982. On this basis, we conclude that, although the cattle appellant brought into the marriage were his separate property, these cattle were replaced by their offspring during the existence of the community. As a result, the cattle existing at the time of the parties' separation were community property. Thus, the profits obtained from the sale of the calves from these community cattle, from the time of the termination of the community to the time of the partition of the community, would be community funds.
*1150 Additional trial testimony established that the approximately 15 head of community cattle had an overall calving rate, from year to year, of approximately 50 percent. Furthermore, the value of these calves was established to be approximately $250 per calf. Based on this information, the trial court used the figure of seven calves per year at $250 per calf to arrive at a figure of $1,750 per year attributable to gross profits on the sale of the calves. This figure then was multiplied by eight years, resulting in an estimated $14,000 for the value of the calves produced. The trial court then awarded half of that amount ($7,000) to appellee. We agree with the trial court's figures in every respect except one. While the trial court apparently was under the impression that eight years had elapsed since the parties separated, seven years plus a few months actually had elapsed. Therefore, a more correct figure attributable to the gross profit on the cattle is $12,750 rather than $14,000.
However, the matter of partitioning the community with regard to the cattle does not end with ascertaining the gross profits on the calves sold. Appellant testified that he fed and cared for the cattle subsequent to the parties' separation. Plainly, appellant should be given a credit for the value of his separate labors and expenses in caring for the cattle subsequent to the termination of the community.
Under the provisions of LSA-C.C.P. Art. 2164, this court shall render any judgment which is just, legal, and proper upon the record on appeal. We conclude that appellee must have invested a minimum of approximately $100 per animal in labor and expenses for which he should be credited. Therefore, we find that the net value attributable to community cattle is $7,650, of which appellee is entitled to $3,825, and the judgment is amended to reflect this change.

Miscellaneous Assets
Appellant asserts that the trial court erred in determining that an all-terrain vehicle (three-wheeler), metal dog trailer, canoe, tool box and tools were community assets. Appellant's detailed descriptive list of community assets does not include these items, while appellee's detailed descriptive list includes all items except the three-wheeler.
The only testimony at trial with regard to these items came from appellant and appellant's father. Appellant testified that the three-wheeler was his separate property because it was a Christmas gift from his grandmother. He further testified that the other items belonged to a family business enterprise and not to him. Appellant's father testified that he was not aware of the business owning a dog trailer, but did recall that the business owned some expensive Catahoula Cur cattle dogs.
In light of the fact that appellant's testimony with regard to ownership of the canoe, tool box and tools was uncontradicted by other testimony or evidence, even though appellee was present in the courtroom at the trial of the partition, we conclude that the trial court erred in holding these items to be community property. On the other hand, because things in the possession of a spouse during the existence of a community are presumed to be community property, LSA-C.C. Art. 2340, we hold that the trial court did not err in concluding that the metal dog trailer belonged to the community when appellant's father was unaware of the family business owning such a trailer. The father testified that he usually knew about any purchases of equipment made by his sons for the family business. Finally, with regard to the three-wheeler, we again note that appellant testified this item was a Christmas gift from his grandmother. We further note that the three-wheeler was not included in appellee's detailed descriptive list of community assets. Additionally, we observe that although the title and bill of sale for the three-wheeler were in appellant's name, these facts are adequately explained by appellant's testimony that his grandmother accompanied him to the ATV dealership where she paid for the three-wheeler. Under those circumstances, it would not be unusual or surprising for the title and bill of sale to bear appellant's name. Furthermore, the January sale date lends *1151 some support to appellant's testimony that the three-wheeler was intended as a Christmas gift. All things considered, we conclude that the trial court erred in declaring the three-wheeler to be community property. The judgment is amended to reflect changes in classification found necessary with regard to these miscellaneous items.

Community Liabilities
Appellant's detailed descriptive list, under the heading of liabilities, included a promissory note in favor of appellant's father, an open account to Donnell's General Mercantile, and an indebtedness to the family corporation for building materials used in constructing appellant's family home. Appellee's traversal of this list denied these liabilities to be community liabilities, and denied the liabilities to be owed by the community. At trial both appellant and appellant's father testified regarding the existence, amount and nature of these debts. Without question, the evidence showed that all three items of debt, to the extent that they had not prescribed, were community liabilities because they were contracted during the existence of the community for the benefit of the community. However, at the conclusion of the trial, the trial court concluded that these debts had prescribed and, accordingly, did not assign them as community debts.
The previously-quoted provisions of LSA-R.S. 9:2801(4)(c) state that the allocation of a liability to a spouse obligates that spouse to extinguish that liability. However, the allocation in no way affects the rights of creditors. These provisions lead us to conclude that the trial court erred in attempting to decide issues of prescription with regard to the community debts. Such a determination was unnecessary under the circumstances presented. Instead, the trial court should have recognized the community nature of the debts, and should simply have divided these liabilities equally between the parties. Then, if the creditors subsequently brought actions to enforce these obligations, the creditors still would have to prove the existence and amount of the particular obligations, and the parties at that time could raise whatever exceptions and defenses they might possess.

CONCLUSION
For the reasons set forth above, we affirm the judgments denying the motion for recusation and the motion for new trial. However, the judgment partitioning the community property is hereby reversed in part and amended in part as follows, beginning with Item No. 4 of the judgment:
"4. Proceeds from crops totalling $8,000 are declared to be community property; therefore, JEWELL N. DONNELL, JR. is ordered to pay unto WANDA H. DONNELL the sum of $4,000.
5. Cattle valued at $12,750 are declared to be community property or property owned by the parties in indivision; therefore, after a credit of $5,100 is deducted from this sum in favor of JEWELL N. DONNELL, JR., he is ordered to pay unto WANDA H. DONNELL the sum of $3,825.
. . . .
8. One (1) Honda ATV three-wheeler, one (1) canoe, and one (1) toolbox with assorted tools are declared not to be community property.
9. One (1) metal dog trailer is declared to be community property, but is to be divided by drawing of lots as previously mentioned.
10. A promissory note in the amount of $30,000 executed by the parties hereto and made payable to Jewell N. Donnell, Sr., et ux, is declared to be a community debt and is hereby assigned in equal portions to the parties.
11. An open account in the amount of $4,975.62 owed to Donnell General Mercantile is declared to be a community debt and is hereby assigned in equal portions to the parties.
12. Indebtedness in the amount of $16,780.85 owed to J.L. and J.N. Donnell, Inc. is declared to be a community debt and is hereby assigned in equal portions to the parties.
The assignment of community liabilities to the parties in Nos. 10, 11 and 12 above neither affects the parties' rights *1152 vis-a-vis third parties, nor is intended to express any opinion with regard to questions of prescription."
Costs of appeal are divided equally between the parties.
REVERSED IN PART, AMENDED, AND RENDERED.